Stephanie A. Hambrick
Wyoming State Bar No. 6-2785
Assistant United States Attorney
District of Wyoming
P.O. Box 22211
Casper, WY 82602
(307) 261-5434
stephanie.hambrick@usdoj.gov

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2018 NOV 21  AM 10: 21

STEPHAN HARRIS, CLERK
CASPER

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

**UNITED STATES OF AMERICA,**

     Plaintiff,

     v.

**$3,451.13 IN U.S. CURRENCY SEIZED
FROM WELLS FARGO BANK ACCOUNT,
NUMBER XXXXXX9770**

**$9,260.32 IN U.S. CURRENCY SEIZED
FROM WELLS FARGO BANK ACCOUNT,
NUMBER XXXXXX5642,**

     Defendants.

Case No. 18-CV-197-F

---

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

---

     The United States of America, by and through Assistant United States Attorney Stephanie

A. Hambrick, brings this verified complaint and alleges as follows in accordance with G(2) of the

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

     This is a civil *in rem* action to forfeit property to the United States under 21 U.S.C.

§ 881(a)(6) as proceeds of and traceable to unlawful sales of controlled substances and 18 U.S.C.

§ 981(a)(1)(A) as property involved in and traceable to a transaction or attempted transaction in violation of section 1956, 2957 or 1960 of this title.

## NATURE OF THE ACTION

This is an action to forfeit and condemn to the use and benefit of the United States of America the following property in the form of United States currency in various amounts:

**$3,451.13 IN U.S. CURRENCY SEIZED FROM WELLS FARGO BANK ACCOUNT, NUMBER XXXXXX9770**

**$9,260.32 IN U.S. CURRENCY SEIZED FROM WELLS FARGO BANK ACCOUNT, NUMBER XXXXXX5642**

(hereinafter "Defendants"), for violations of 18 U.S.C. § 1956 and 21 U.S.C. §§ 841(a)(1) and 846.

## THE DEFENDANTS *IN REM*

The Defendants consist of the following property currently in the custody of the Drug Enforcement Agency:

**$3,451.13 IN U.S. CURRENCY SEIZED FROM WELLS FARGO BANK ACCOUNT, NUMBER XXXXXX9770**

**$9,260.32 IN U.S. CURRENCY SEIZED FROM WELLS FARGO BANK ACCOUNT, NUMBER XXXXXX5642**

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1345 because this action is being commenced by the United States and under 28 U.S.C. § 1355(a) because this is a civil forfeiture action. Upon filing of this complaint, the Plaintiff requests the Court issue arrest warrants *in rem* pursuant to Supplement Rule G(3)(b), which the Plaintiff will execute upon the Defendants pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) where any of the acts or omissions giving rise to the forfeiture occurred.

## LEGAL BASIS FOR FORFEITURE

Title 21, United States Code, Section 881(a)(6) authorizes the civil forfeiture of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter [21 U.S.C. Subchapter I, §§ 801-904]." The United States alleges that the Defendants are subject to forfeiture under § 881(a)(6) because each property constitutes the proceeds of, and is traceable to, unlawful sales of controlled substances in violation of 21 U.S.C. §§ 841 and 846.

Title 18, United States Code, Section 981(a)(1)(A) authorizes the civil forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property." The United States alleges that the Defendants are subject to forfeiture under § 981(a)(1)(A) because each of the properties were involved in, and traceable to, money laundering in violation of 18 U.S.C. § 1956.

## DECLARATION OF DAVID A. TYREE

I, Special Agent David A. Tyree, do hereby declare:

This declaration is being submitted in support of an application for the complaint *in rem* for forfeiture of the following bank accounts:

**$3,451.13 IN U.S. CURRENCY SEIZED FROM WELLS FARGO BANK ACCOUNT, NUMBER XXXXXX9770**

**$9,260.32 IN U.S. CURRENCY SEIZED FROM WELLS FARGO BANK ACCOUNT, NUMBER XXXXXX5642**

1. The bank accounts will be collectively referred to as **"Defendant Bank Accounts."** In this declaration I will demonstrate, based on the evidence I have reviewed, that there is probable cause

to believe that the Defendant Bank Accounts were used to facilitate an ongoing drug money laundering operation and therefore constitute property involved in violations of Title 21 U.S.C. §§ 841(a)(1), 846 and Title 18 U.S.C § 1956(a) (1) (B) (i), making them forfeitable pursuant to the provisions of Title U.S.C. § 881(a)(6), Title 18 U.S.C. § 981(a) (1) (A) and Title 18 U.S.C § 984.

2.      The facts in this declaration come from my personal observations, my training, experience and information obtained from other law enforcement and witnesses.  This declaration is for the limited purpose of establishing probable cause and therefore, I have not set forth each and every fact I have learned during this investigation, but only those facts and circumstances necessary to establish probable cause.

### Agent Background

3.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and I have been employed with the DEA since September of 1998. I am a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore I am empowered to conduct investigations of, and make arrests for, the offenses enumerated in Title 21 and Title 18.  Accordingly, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General.

4.      In the course of my career as a DEA Special Agent, I have been assigned to the Eugene, Oregon, Resident Office, the Albuquerque, New Mexico, District Office, the Portland, Oregon, District Office, the Lisbon, Portugal, Country Office (where my area of responsibility included Cape Verde, Africa, and Guinea Bissau, Africa) and since June 2016, the Cheyenne, Wyoming, Resident Office.  In November 2017, I was promoted to Resident Agent in Charge of the Cheyenne

Resident Office which presently includes the oversight and supervision of the law enforcement of the DEA and DEA Task Force Officers in the State of Wyoming and the Fort Collins, Colorado Post of Duty.

5.      I have written and directly been involved in writing no fewer than 20 search and seizure warrants and I have participated in the service of no fewer than 100 federal search warrants involving drug violations, money laundering and other criminal activities during which evidence of criminal violations was seized.

6.      I know from my training and experience that bulk quantities of narcotics are often exchanged for bulk-banded amounts of currency. Bulk-banded currency refers to the manner in which bulk cash is banded in thousand or multi-thousand dollar increments, which facilitates a quick count in a public area when drugs and money are exchanged. For example, $100,000.00 in drug proceeds might be bulk-banded in ten, ten-thousand dollar bundles or four $25,000.00 bundles. Although the amount of bulk-banded currency is not standardized, I know from training and experience that this money packaging process is consistent among drug trafficking organizations because it allows the money courier and/or the drug courier to quickly confirm the amount of money received without the laborious and time intensive efforts required to count out $100,000.00 in a public setting. Furthermore, often times, drug trafficking organizations will seal the drug proceeds in heat-sealed plastic packaging to prevent the courier from stealing any of the drug proceeds.

7.      According to the El Paso Intelligence Center (EPIC), a tactical, operational and strategic intelligence support center that supports federal, state, tribal and international law enforcement organizations, in 2016, law enforcement in the United States seized approximately $453,787,000.00 in bulk cash that was determined to be suspected drug proceeds. According to

EPIC, in 2017, law enforcement in the United States seized approximately $204,400,998.00 in bulk cash that was determined to be suspected drug proceeds. This information only captures the suspected bulk cash drug proceeds seized by law enforcement. I know that sophisticated drug trafficking organizations, in an attempt to find alternatives to the transportation of bulk currency, often search out alternatives, like bank accounts, they can access to introduce and also launder their drug proceeds back to the sources of supply.

8.    To date, my participation in drug trafficking investigations has resulted in both the successful prosecution of numerous individuals and the forfeiture to the United States Government of assets purchased with proceeds from unlawful drug trafficking, as well as assets used to facilitate drug violations. I have participated in and/or executed numerous search warrants of locations that included, but were not limited to, residences of drug traffickers and their conspirators/associates and    stash    houses    used    as    storage    and    distribution    points.

9.    Materials searched for and recovered in these locations have included various controlled substances, including heroin, cocaine, marijuana and methamphetamine; drug paraphernalia such as scales, papers and drug packaging materials; books and records reflecting sales, the transfer of transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of conspirators; sales receipts and other records reflecting the expenditure of monies that are the proceeds from unlawful drug distribution; currency and money wrappers; and various valuable assets (*i.e.*, real property, automobiles, precious metals, etc.) purchased with the proceeds of unlawful drug trafficking. These items, obtained by either search warrant or consent search, constituted evidence of drug violations (21 U.S.C. §§ 841(a)(1), 846 and 848,), the acquisition of assets with drug trafficking proceeds and the use of these assets to facilitate drug trafficking violations (21 U.S.C. § 853), in addition to violations of the Internal

Revenue Service Laws and the Money Laundering Control Act which further aided the government in the identification and indictment of conspirators.

10.     Based upon my training and experience and my participation in this investigation and other drug trafficking investigations, I have reason to believe that:

11.     Drug trafficking is a cash-intensive industry where cash is exchanged for narcotics at both the drug-user level and also during large drug exchanges.

12.     Drug trafficking organizations will accumulate drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs.

13.     Drug trafficking organizations will commonly attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (*i.e.*, safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, and brokerage houses). Drug traffickers will also commonly attempt to legitimize the profits from illegal drug transactions through shell corporations, business fronts and purchasing real estate. When drugs are sold, they are sold for cash and this cash has to make it back to the source of supply to finance the continuing criminal enterprise. However, unlike legitimate business, due to the very nature of the criminal enterprise, drug suppliers and drug sellers are vulnerable not only to law enforcement efforts to disrupt and dismantle their criminal organizations, but they are also vulnerable to each other and other criminal elements seeking financial gain. To that end, it is not a common practice for the drug distributor to know where the drug seller secretes the drug proceeds nor is it an industry standard for the drug seller to know where the drug distributor maintains their bulk drug storage. By the very nature of this established practice, which in theory, prevents robbery from either side of the organization (supply and distribution), both parties are often forced to meet in public places to conduct the

7

exchange of drugs for money. This practice is well known in the judicial system which is why there are often criminal cases in the courts involving the prosecution of drug couriers in addition to law enforcements administrative seizure of significant amounts of suspected drug proceeds from interdictions at airports, bus stations, train stations, highways and U.S. mail, both government and commercial.

14.     Drug traffickers involved in the sale of marijuana, often maintain photos of their marijuana in budded form as an example of the quality of the marijuana they sell.

15.     I know cash that has been exposed to raw marijuana often retains that odor on the cash and when that cash is deposited into financial institutions, the financial institutions can report that information to law enforcement. Furthermore, I know from training and experience, coupled with a review of information received in this investigation, that cash derived from the sale of raw marijuana often smells of raw marijuana. Furthermore, marijuana traffickers have difficulty depositing cash into the financial system that smells like raw marijuana, without attracting the unwanted attention of bank personnel. To avoid this unwanted attention, drug traffickers involved in the sale of marijuana, will oftentimes purchase casino chips at a casino with drug proceeds that smell of raw marijuana. They then exchange the casino chips for cash, paid out by the casino which does not smell of raw marijuana, thereby avoiding the smell of raw marijuana on their money when they deposit it into financial institutions.

16.     I know from training and experience that drug trafficking organizations involved in drug money laundering operations will often use the services of what might appear to be a legitimate industry (e.g. a real estate company or other limited liability corporation) to introduce their drug proceeds into the financial system through the comingling of legitimate and illegitimate funds into the industry account. Often times, the "legitimate" accounts are used to launder the drug proceeds

and they may contain legitimate transactions which makes the illegitimate funds much more difficult to identify.

17.    I know, from training and experience, that drug money launderers often use casinos to launder their drug proceeds. For example, a drug money launderer may choose to load drug money into a slot machine, gamble a small portion of the money and then cash out from the slot machine, thereby "cleaning" the drug money because it now appears as slot machine winnings.

18.    Based on the fact that drug trafficking is a cash-intensive industry, I have familiarized myself with the three layers of money laundering described as the "placement phase," the "layering phase" and the "integration phase." The three phases of money laundering are defined by the Office of the Comptroller of Currency. The three phases of money laundering are described below:

19.    **Placement Phase:** The process of placing, through deposits or other means, unlawful cash proceeds into traditional financial institutions. In the placement phase of a money laundering operation, the "dirty" money is introduced into the financial system. Generally, this phase serves two purposes: (1) it relieves the criminal organization of holding and guarding large amounts of bulk currency; and (2) it places the money into the legitimate financial system. It is during the placement stage that money launderers are the most vulnerable to being caught due to the fact that placing large amounts of money (cash) into the legitimate financial system may raise suspicions of law enforcement or bank officials. The placement of "dirty money" can be done in a number of ways. For example, cash could be smuggled to a country where the launderer could use multiple individuals to deposit the funds into that country's financial institutions. As an alternative, multiple accounts associated to the same person or persons could be used to break up the cash deposits which would defeat reporting threshold laws and avoid suspicion. Some other common methods include (1) the purchase of gambling chips or placing offsetting bets on sporting events

9

and claiming the winnings; (2) currency smuggling, which is the physical movement of illegal currency or monetary instruments outside of the country of origin; (3) currency exchanges ("Casas de Cambio") which facilitate the purchasing of foreign money with illegal funds through foreign currency exchanges; and (4) blending funds, which is the use of what one would consider a legitimate, cash intensive business to co-mingle dirty funds with the day's legitimate sales receipts.

20.     **Layering Phase:** During the layering phase, proceeds of criminal activity are separated from their origin through the use of layers of complex financial transactions. The layering phase is the most complex and can involve the international movement of the funds to what might appear as a legitimate business, when in fact the business is the front used to layer the "dirty money." This is done through a series of sophisticated financial transactions that obscure the "money trail." During the layering phase, for example, the money launderers may begin by moving funds electronically from one country to another, and then divide them into a number of financial instruments, such as advanced financial options or overseas markets. The funds are constantly moved to elude detection, each time exploiting loopholes or discrepancies in the laws of the jurisdiction involved and taking advantage of delays in judicial or police cooperation.

21.     **Integration Phase:** The process of making the illicit funds appear to be part of licit transactions within the financial system. Different types of financial transactions, such as sham loans or false import/export invoices can be used. The integration phase is the final phase of the money laundering process. It is at the integration stage where the money is returned to the criminal from what seem to be legitimate sources. Having been placed initially as cash and layered through a number of financial transactions, the criminal proceeds are now fully integrated into the financial system and can be used for any purpose without the risk of confiscation by law enforcement. There are many different ways in which the laundered money can be integrated back with the criminal;

however, the major objective at this stage is to reunite the money with the criminal in a manner that does not draw attention and appears to result from a legitimate source. For example, the purchases of property, artwork, jewelry, or high-end automobiles are common ways for the launderer to enjoy their illegal profits without necessarily drawing attention to them.

22.     Although there are three phases in a money laundering operation (placement, layering and integration), I know from training and experience that money launderers often use multiple methods within each phase of a money laundering operation to avoid detection from the financial institution and/or law enforcement.  I know from training and experience that it is not uncommon for a drug trafficking organization to seek the assistance of legal accounting and financial industry professionals to assist them in their efforts to launder their ill-gotten gains.

23.     By virtue of the fact that illegal drugs are almost always sold for cash, oftentimes to avoid a paper trail, I know from training and experience, the criminal organization must find a way to introduce the cash into the financial system without attracting the attention of the financial institution and/or law enforcement.   This process of disguising the cash is referred to as "concealment."   I know from both training and experience that in order to prove a money laundering violation, law enforcement must demonstrate that the individual or individuals charged for the violation made efforts to "conceal" the nature, origin and/or ownership of the ill-gotten gains.

24.     Title 31, United States Code, section 5313 and 31 C.F.R. Chapter X, Part 1010.311 of the Bank Secrecy Act ("BSA") requires that any financial institution that engages with a customer in a currency transaction (*i.e.*, a deposit or withdrawal) in excess of $10,000.00 to report the transaction to the Department of the Treasury on FinCEN Form 104, Currency Transaction Form ("CTR"). These regulations also require that multiple transactions be treated as a single transaction

if the financial institution has knowledge that they are by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000.00 during any one-business day. Many individuals involved in these illegal activities are aware of such reporting requirements and take active steps to attempt to cause financial institutions to fail to file CTRs. These active steps are often referred to as "smurfing" or "structuring" and involve dividing a sum of money greater than $10,000.00 and making multiple cash deposits, in amounts less than $10,000.00 in order to avoid the $10,000.00 reporting requirement. Structuring is defined in and prohibited by 31 U.S.C. §5324(a) (3).

25.    In an attempt to avoid the CTR filing requirement, I know that it is a common practice for money launderers who launder drug proceeds at casinos, to purchase and/or redeem casino chips in amounts less than $10,000.00 in an attempt to avoid the CTR reporting requirement which may draw the attention of law enforcement.

26.    I know from training and experience that one way to launder drug money is through a casino by purchasing gambling chips from the casino with drug money, gambling with a portion of the chips and then redeeming the value of the chips as clean "cash."

27.    I know that drug traffickers involved in the interstate transportation of narcotics oftentimes use various methods to launder their ill-gotten gains. Methods involved in the placement phase of a drug money laundering operation include opening up "front" companies to introduce drug proceeds by comingling the dirty money with what appears to be legitimate income. A second method to launder drug proceeds I identified in this investigation is to purchase casino chips with drug proceeds and then redeem them at a later date or with different individuals, creating both a "paper trail" which might justify ill-gotten gains (e.g. "this money is not from the sale of drugs but from casino winnings"). To accomplish this task at casinos, I know that it is a common practice

for drug traffickers to exchange drug money for casino chips and then exchange the casino chips for "clean money."

28.     I know from my training and experience, that in an attempt to avoid detection from management within casinos, it is a common practice for drug traffickers involved in money laundering to purchase casino chips on one day, depart the casino and either have a different individual redeem the casino chips later that same day or on a different day or alternatively, return to the casino at a later date to redeem the cash value of the casino chips.

29.     I know from my training and experience that individuals involved in the transportation of marijuana and the depositing of drug proceeds into bank accounts, referred to as "couriers" often maintain photographic evidence of the marijuana they sell and also photographs of deposit slips for cash deposits made into financial institutions from the sale of marijuana, as proof they can send to the drug trafficking organization to avoid accusations that the couriers stole drug money.

### Information Related to Marijuana Cultivation

30.     Based on my training and experience, I know that subjects involved in the illegal trafficking of marijuana commonly operate in states like Washington, Oregon, California or Colorado where state law allows for the regulated cultivation of marijuana to hide their criminal activity.

31.     I know that states like Washington, Oregon, California and Colorado are source states for black market marijuana and marijuana products where are diverted to other states.  Furthermore, I know that marijuana purchased within the states of Washington, Oregon, California and Colorado can double or triple in price when taken outside the state, thereby creating the opportunity for large profit margins.

32.     I have been involved in the investigation of numerous marijuana-related manufacturing and smuggling schemes originating from the illegal cultivation of marijuana within the states of

Oregon, California, Washington and Colorado, which have been diverted to multiple other states across the United States.

### Background of the Investigation

33.     On April 14, 2018, the Wyoming Highway Patrol (WHP) dispatch contacted Wyoming DCI Special Agent Jason Moon (SA Moon) and advised him that a WHP Trooper had contacted a vehicle on Interstate 80 eastbound at milepost 370 in Laramie County, Wyoming.  WHP dispatch advised WHP Trooper Gebauer was requesting assistance with the investigation.  SA Moon agreed to meet Trooper Gebauer at the Drug Enforcement Administration (DEA) Task Force Office in Cheyenne, Wyoming, and assist with the investigation.

34.     Trooper Gebauer stated to SA Moon that Trooper Gebauer had been working the road closure point at mile post 370 when he was contacted by a female and a male in a blue 2018 Nissan Maxima, Nevada license 87F728, traveling eastbound on Interstate 80.  Trooper Gebauer stated that the female was identified as Ngoc Thi Bich PHAM (PHAM), the driver of the vehicle and Hung Minh NGUYEN (NGUYEN), the front passenger of the vehicle.

35.     When he was contacted by PHAM and NGUYEN he noticed the odor of marijuana emitting from the vehicle.  Based on the odor of raw marijuana emitting from the vehicle, Trooper Gebauer determined that there was probable cause to search the vehicle for narcotics and contraband.  Trooper Gebauer conducted a search of the vehicle and found what he believed to be a felony amount of suspected marijuana in the back seat and trunk of the vehicle.  Trooper Gebauer stated PHAM and NGUYEN were arrested for felony possession of marijuana, and possession with intent to distribute marijuana and conspiracy.

36.     Trooper Gebauer and Trooper Bell transported PHAM and NGUYEN along with the blue 2018 Nissan Maxima, Nevada license 87F728 to the DEA Drug Task Force Office in Cheyenne, Wyoming.

37.     On April 14, 2018, SA Moon assisted Trooper Gebauer and Trooper Bell with completing the search of the vehicle at the DEA Drug Task Force Office in Cheyenne, Wyoming. The search of the vehicle resulted in the location and seizure of approximately 100 pounds of suspected marijuana. PHAM and NGUYEN were charged at the state level and their criminal case has not yet been adjudicated. [1]

38.     On April 14, 2018, SA Moon conducted a recorded, custodial interview with NGUYEN. SA Moon explained to NGUYEN that NGUYEN was under arrest. In a post-arrest interview, NGUYEN stated that he did not know the actual street address to the residence where he lived, but that it was his brother's house. NGUYEN stated his brother's name is Wayne Minh NGUYEN. The investigation subsequently revealed that Wayne NGUYEN, also known as "Kaizen" NGUYEN had rented the vehicle that PHAM and NGUYEN were traveling in.

39.     NGUYEN stated they were driving from Washington State to Charlotte, North Carolina. NGUYEN stated the purpose of the trip was to move the "stuff" from Washington to there for somebody. NGUYEN clarified the "stuff" was the approximately 100 pounds of marijuana located inside the vehicle that NGUYEN and PHAM were driving. NGUYEN stated that when he arrived in North Carolina someone would contact him on his phone and tell him what to do with the

---

[1]     On September 21, 2018, PHAM was one of three subjects that were stopped in a vehicle with a Washington license plate in Missouri with what was estimated to be approximately $10,000.00 in U.S. currency that was suspected drug proceeds. Due to state laws in Missouri, the currency was not seized despite what officers determined to be probable cause to seize the money because there was not an accompanying criminal violation, which is required in the state of Missouri to seize suspected drug proceeds.

marijuana. NGUYEN stated he did not who would contact him and that he just delivered the "stuff." NGUYEN stated this was the first time he had transported marijuana.

40.     NGUYEN stated he became involved in this activity through unidentified individuals in Washington. NGUYEN stated the paperwork and bank receipts in the vehicle did not belong to him. NGUYEN stated PHAM (the driver of the vehicle) was his sister-in-law and he had to have dialysis so he had asked her to drive with him on this trip. NGUYEN stated he was going to give PHAM "a couple thousand" to drive with him. NGUYEN stated he was going to get paid ($15,000.00) to ($18,000.00) when he arrived in North Carolina. According to records received in this investigation, the vehicle was rented by Wayne NGUEN and insured by Lieu LAM.

41.     NGUYEN stated when he got paid for the trip "they" would give him the money in cash. NGUYEN stated he had picked up the vehicle from Enterprise Rental. NGUYEN stated the marijuana was put in the vehicle at a gas station in Seattle, Washington. NGUYEN stated the marijuana was in the rental vehicle when he had picked up PHAM to go on the trip with him. NGUYEN stated he thought he met two men at a Chevron gas station when the marijuana was loaded in the vehicle in Washington. NGUYEN stated the men talked to him about the trip to North Carolina. The interview was terminated at that time.

42.     On April 14, 2018, at approximately 4:49 p.m., SA Moon conducted a recorded, custodial interview with PHAM. SA Moon explained to PHAM that she was not free to leave. SA Moon advised PHAM of her rights as they pertained to Miranda. SA Moon was not sure if PHAM understood enough English to comprehend the situation or the advisement of her rights. Upon further conversation between SA Moon and PHAM, PHAM stated she might need a translator or to talk to a lawyer and the interview with PHAM was terminated.

43.     On May 7, 2018, SA Moon executed a state of Wyoming search warrant on the phone seized from PHAM at the time of her arrest. I reviewed photographs maintained on PHAM's phone and observed photographs of raw, processed marijuana.

44.     Subsequent to the arrest of PHAM and NGUYEN, the Cheyenne DEA initiated a financial investigation into the suspected drug money laundering of PHAM and NGUYEN. In the course of the investigation, law enforcement identified seven bank accounts which based on the facts and circumstances were suspected of containing, either in part, or in whole drug proceeds and/or used to launder drug money.

## FINANCIAL INVESTIGATION

45.     In the course of the financial investigation, law enforcement identified several bank accounts associated to PHAM either by address, name or a joint-account holder, believed to contain drug proceeds or to have been used in the money laundering scheme by this criminal drug trafficking organization. In addition, law enforcement identified casino activity related to PHAM, which also appeared to be indicative of drug money laundering and is described below.

46.     With regard to PHAM, law enforcement identified the following activity reported by the Muckleshoot Casino, 2402 Auburn Way South, Auburn, Washington.

### PHAM and the Muckleshoot Casino

47.     While reviewing available information from the Muckleshoot Casino in Auburn, Washington, related to PHAM, I identified the following activity which is indicative of drug money laundering.

48.     On January 8, 2017, PHAM departed the Muckleshoot Casino with $7,000.00 in casino chips.

49.     On January 9, 2017, PHAM departed the Muckleshoot Casino with $11,450.00 in casino chips.

50.     On January 10, 2017, PHAM departed the Muckleshoot Casino with $10,300.00 in casino chips.

51.     On January 12, 2017, PHAM departed the Muckleshoot Casino with $10,450.00 in casino chips.

52.     On January 20, 2017, PHAM cashed out/redeemed $12,500.00 in casino chips at the Muckleshoot Casino.

53.     On January 26, 2017, PHAM departed the Muckleshoot Casino with $12,500.00 in casino chips.

54.     On January 29, 2017, PHAM departed the Muckleshoot Casino with $14,800.00 in casino chips.

55.     On January 30, 2017, PHAM departed the Muckleshoot Casino with $6,075.00 in casino chips.

56.     On January 30, 2017, PHAM purchased $10,100.00 in casino chips at the Muckleshoot Casino.

57.     On February 1, 2017, PHAM departed the Muckleshoot Casino with $8,000.00 in casino chips.

58.     On February 8, 2017, PHAM departed the Muckleshoot Casino with $9,975.00 in casino chips.

59.     On February 9, 2017, PHAM departed the Muckleshoot Casino with $8,600.00 in casino chips.

60.     On February 28, 2017, PHAM departed the Muckleshoot Casino with $6,750.00 in casino chips.

61.     On March 31, 2017, PHAM departed the Muckleshoot Casino with $12,500.00 in casino chips.

62.     On May 13, 2017, PHAM departed the Muckleshoot Casino with $14,000.00 in casino chips.

63.     On June 16, 2017, PHAM departed the Muckleshoot Casino with $9,400.00 in casino chips.

64.     On June 18, 2017, PHAM cashed out $12,200.00 in casino chips at the Muckleshoot Casino.

65.     On June 26, 2017, PHAM purchased $11,630.00 in casino chips at the Muckleshoot Casino.

66.     On June 27, 2017, PHAM departed the Muckleshoot Casino with $10,700.00 in casino chips.

67.     On July 12, 2017, PHAM departed the Muckleshoot Casino with $8,400.00 in casino chips.

68.     Based on the records received from the Muckleshoot Casino, thus far, between January 8, 2017, and July 12, 2017, PHAM departed the Muckleshoot casino with $160,500.00 in casino chips. During that same period, I observed that PHAM introduced $21,730.00 as cash to purchase casino chips and converted $24,800.00 in chips to cash.  Based on my training and experience, coupled with the evidence I have reviewed thus far in this investigation, I believe that PHAM is using the services of the Muckleshoot Casino in Auburn, Washington to launder drug proceeds.

## Bank Accounts Seized by the DEA on May 25, 2018

69.     Drugs are sold for cash. Drug trafficking organizations oftentimes use couriers to transport from point of origin to destination and the couriers return to point of origin with the drug proceeds. This is both labor intensive and it subjects the drug trafficking organization to potential law enforcement contact and the seizure of both drugs and/or suspected drug proceeds.

70.     I know from both training and experience that to avoid the seizure of drug proceeds from interdiction efforts, drug trafficking organizations oftentimes use bank accounts to deposit the drug proceeds at the point of sale (destination) to avoid law enforcement efforts to interdict and seize the drug proceeds.  To accomplish this task, the courier will typically make round-numbered cash deposits consistent with the sale of narcotics into a bank account or series of bank accounts and then confirm that the deposit has occurred by taking a photograph of the deposit slip and sending same back to the leadership within the drug trafficking organization.

71.     In the course of this investigation, law enforcement identified several round-numbered cash deposits into several bank accounts associated to PHAM.  In addition, to further support the suspicion that the round-numbered cash deposits into the accounts identified are from the illegal sale of marijuana, one cash deposit into one of the accounts identified, in the amount of $980.00 was reported by Wells Fargo bank in December 2017, because the cash allegedly smelled like marijuana.

72.     Financial analysis revealed over $300,000.00 in round-numbered cash deposits into the accounts identified in this case which were transferred out of the accounts identified approximately two weeks after PHAM's arrest on April 14, 2018, in Wyoming.

73.     In the course of this investigation, law enforcement identified five bank accounts linked to PHAM either by name or through the movement of money.  The accounts are as follows:

74.     **SUBJECT ACCOUNT 1:** Wells Fargo Bank account XXXXXX3867. According to Wells Fargo Bank records, SUBJECT ACCOUNT 1 is a joint-account shared by Huang Ma DAFU and Bich-Ngoc PHAM which was opened on September 14, 2017. On May 25, 2018, United States Magistrate Judge Kelly H. Rankin issued a seizure warrant for this account based on a finding of probable cause in the District of Wyoming. The warrant was served to Wells Fargo Bank that same date and due to the insufficient balance in the account, the account was not seized.

75.     **SUBJECT ACCOUNT 2:** Wells Fargo Bank account XXXXXX3696, titled in the names of Bich-Ngoc T. PHAM and Cyndy LAM, doing business as "NGOC-HOANG PROPERTY, LLC." According to Wells Fargo Bank records, the account was opened on December 5, 2016. On May 25, 2018, United States Magistrate Judge Kelly H. Rankin issued a seizure warrant for this account based on a finding of probable cause in the District of Wyoming. The warrant was served to Wells Fargo Bank that same date and due to the insufficient balance in the account, the account was not seized.

76.     **SUBJECT ACCOUNT 3:** Wells Fargo Bank account XXXXXX4656, titled in the name of NGOC-HOANG Property, LLC, owned by Bich-Ngoc PHAM, opened on December 5, 2016. On May 25, 2018, United States Magistrate Judge Kelly H. Rankin issued a seizure warrant for this account based on a finding of probable cause in the District of Wyoming. The warrant was served to Wells Fargo Bank that same date and due to the insufficient balance in the account, the account was not seized.

77.     **Defendant Bank Account# XXXXXX9770 also known as SUBJECT ACCOUNT 4:** This account is titled in the name of Huang Ma DAFU. According to Wells Fargo Bank records, the account was opened on April 6, 2017. Huang Ma DAFU is a joint-account holder with PHAM for SUBJECT ACCOUNT 1. SUBJECT ACCOUNT 4 is one of the two accounts that Shiming

HUANG has filed a timely administrative claim on. The address associated to this account is 21513 131st Street E., Sumner, Washington. The phone number associated to the bank account is 208-890-9673. The Social Security Number associated to the bank account is XXX-XX-5464 and year of birth associated to the account is 1953. On May 25, 2018, United States Magistrate Judge Kelly H. Rankin issued a seizure warrant for this account based on a finding of probable cause in the District of Wyoming. The warrant was served to Wells Fargo Bank that same date and $3,451.13 was seized from the account.

78.    **Defendant Bank Account#XXXXXXXXXX5642 also known as SUBJECT ACCOUNT 5:** This account is titled in the name of Huang Ma DAFU, Shiming HUANG and Xiuyan ZHANG. Huang Ma DAFU is a joint-account holder with PHAM for SUBJECT ACCOUNT 1. On May 25, 2018, United States Magistrate Judge Kelly H. Rankin issued a seizure warrant for this account based on a finding of probable cause in the District of Wyoming. The warrant was served to Wells Fargo Bank that same date and $$9,260.32 was seized from the account.

The addresses and other information associated to the account is as follows:

a.    Account Holder 1: Huang MA DAFU with the address of 21513 131st Street, E. Sumner, Washington. The phone number associated to the bank account is 208-890-9673. The Social Security Number associated to the bank account is XXX-XX-5464 and year of birth associated to the account is 1953.

b.    Account Holder 2: Shiming HUANG (claimant) with the address of 10431 W. Bear Lake Drive, Boise, Idaho. The telephone number associated to the account is 208-867-7597. The Social Security Number associated to the account is XXX-XX-8578 and the year of birth associated to the account is 1977.

c.      Account Holder 3: Xiuyan ZHANG with the address of 10431 W. Bear Lake Drive, Boise, Idaho. The telephone number associated to the account is 208-890-9673. The Social Security Number associated to the account is XXX-XX-8394 and the year of birth associated to the account is 1953.

79.     According to information obtained in the course of this investigation, Shiming HUANG is believed to be the adult child of Huang MA DAFU and Xiuyan ZHANG.

80.     In this investigation, when reviewing financial transactions and information related to the Wells Fargo bank accounts listed above, I initially reviewed bank transactional records from November 13, 2017, and December 16, 2017, which reflected seven cash deposits into SUBJECT ACCOUNT 4 and SUBJECT ACCOUNT 5 at six branch locations in Gainesville and Lawrenceville, Georgia, Huntsville, Alabama, North Charleston, South Carolina, Tacoma and Seattle, Washington, in amounts ranging from $980.00 to $9,000.00, totaling $34,980.00. Of those deposits, Wells Fargo bank reported that on December 16, 2017, a cash deposit that was made in the amount of $980.00 smelled of marijuana.

81.     In a drug money laundering operation, it is critical to identify as many accounts as possible that may be "tied to and involved in" the operation. In this investigation, I do not believe that I have identified each and every account involved in this operation. However, I have identified several Wells Fargo Bank accounts that are linked to each other through name, account holder or joint-account holder. Based on my training and experience, I know that it is a common practice for drug money launderers to use multiple accounts to introduce and launder drug proceeds. Detailed below are the linked accounts and analysis.

## ANALYSIS OF SUBJECT ACCOUNT 1- XXXXXX3867

82.    From the records obtained in the course of this investigation, I observed that from January 31, 2018, through March 8, 2018, there were eight credits into SUBJECT ACCOUNT 1, which totaled $20,820.00.

83.    On January 31, 2018, there was a $5,500.00 credit into SUBJECT ACCOUNT 1 from Wells Fargo Bank account XXXXXX9173 that occurred in Danville, Virginia.

84.    On February 5, 2018, there was a $2,500.00 credit into SUBJECT ACCOUNT 1 in the form of a transfer from SUBJECT ACCOUNT 2.

85.    On February 6, 2018, there was a $700.00 cash deposit into SUBJECT ACCOUNT 1 that occurred in Lilburn, Georgia.

86.    On February 9, 2018, there was a $3,000.00 credit into SUBJECT ACCOUNT 1 in the form of a transfer from SUBJECT ACCOUNT 2.

87.    On February 13, 2018, there was a $1,500.00 credit into SUBJECT ACCOUNT 1 in the form of a transfer from SUBJECT ACCOUNT 2.

88.    On February 21, 2018, there was a $5,000.00 cash deposit into SUBJECT ACCOUNT 1 that occurred in Danville, Virginia.

89.    On March 2, 2018, there was an $820.00 cash deposit into SUBJECT ACCOUNT 1 that occurred via an Automated Teller Machine (ATM) in Tacoma, Washington.

90.    On March 8, 2018, there was a $1,800.00 cash deposit into SUBJECT ACCOUNT 1 that occurred via ATM in Tacoma, Washington.

91.    Analysis of funds spent from SUBJECT ACCOUNT 1 revealed the following:

92.    On February 2, 2018, SUBJECT ACCOUNT 1, approximately 48 hours after receiving a $5,500.00 credit in the form of a transfer from Wells Fargo Bank account XXXXXX9173, issued

on an online transfer to SUBJECT ACCOUNT 2 in the amount of $5,500.00.  On February 8, 2018, there was a $500.00 transfer from SUBJECT ACCOUNT 1 to SUBJECT ACCOUNT 2.

93.    On February 5, 2018, there was $2,500.00 paid to American Express account ending in 91002 and a $500.00 payment to the same American Express account on February 8, 2018.

94.    On February 9, 2018, the same date that there was a $3,000.00 credit into SUBJECT ACCOUNT 1 from SUBJECT ACCOUNT 2, there was a $3,000.00 cash withdrawal from SUBJECT ACCOUNT 1.

95.    On February 14, 2018, there was a $1,500.00 credit card payment to a USAA Bank credit card ending in 73720.

96.    On February 23, 2018, approximately 48 hours after SUBJECT ACCOUNT 1 received a $5,000.00 cash deposit into the account in Danville, Florida, there was a $5,000.00 online transfer to SUBJECT ACCOUNT 3.

97.    On March 5, 2018, there was an $800.00 credit card payment to "Bank NA" with account ending in 74990.  On March 9, 2018, there was a second credit card payment in the amount of $1,800.00 to "Bank NA" with account ending in 74990.

## ANALYSIS OF SUBJECT ACCOUNT 2 – XXXXXX3969

98.    Analysis of SUBJECT ACCOUNT 2 revealed the following information that between the dates of February 6, 2018, and March 7, 2018.  There were fourteen, round-numbered cash deposits, which totaled $46,000.00 made into SUBJECT ACCOUNT 2.  The deposit dates, amounts and locations are detailed in the chart below:

| 01/25/18 | $4,500.00 | DANVILLE, VA |
| 01/30/18 | $5,000.00 | NORCROSS, GA |
| 02/06/18 | $5,000.00 | DANVILLE, VA |
| 02/08/18 | $6,000.00 | DANVILLE, VA |
| 02/13/18 | $600.00 | NORTH CHARLESTON, SC |

| 02/13/18 | $700.00 | NORTH CHARLESTON, SC |
|---|---|---|
| 02/13/18 | $600.00 | NORTH CHARLESTON, SC |
| 02/13/18 | $500.00 | NORTH CHARLESTON, SC |
| 02/13/18 | $600.00 | NORTH CHARLESTON, SC |
| 02/14/18 | $5,500.00 | DANVILLE, VA |
| 02/21/18 | $4,500.00 | DANVILLE, VA |
| 02/23/18 | $6,500.00 | DANVILLE, VA |
| 02/26/18 | $5,000.00 | NORTH CHARLESTON, SC |
| 03/05/18 | $5,000.00 | DANVILLE, VA |
| 03/07/18 | $5,000.00 | DANVILLE, VA |

99.     Analysis of SUBJECT ACCOUNT 2 revealed that on February 2, 2018, there was $5,000.00 credit transfer into SUBJECT ACCOUNT 2 from SUBJECT ACCOUNT 1. There was a second transfer from SUBJECT ACCOUNT 1 to SUBJECT ACCOUNT 2 on February 8, 2018, in the amount of $500.00.

100.    Analysis revealed there were only two debits from the account in the form of debit card purchases totaling $4,638.90.

### ANALYSIS OF SUBJECT ACCOUNT 3 – XXXX4656

101.    Analysis of SUBJECT ACCOUNT 3 revealed that between January 25, 2018, and March 7, 2018, there were twelve cash deposits into SUBJECT ACCOUNT 3, which totaled $33,040.00. The chart below details that dates and locations of the cash deposits into SUBJECT ACCOUNT 3:

| 01/25/18 | $5,000.00 | DANVILLE, VA |
|---|---|---|
| 01/31/18 | $5,000.00 | DANVILLE, VA |
| 02/06/18 | $4,500.00 | DANVILLE, VA |
| 02/12/18 | $240.00 | NORTH CHARLESTON, SC |

| 02/12/18 | $300.00 | NORTH CHARLESTON, SC |
|---|---|---|
| 02/12/18 | $2,500.00 | NORTH CHARLESTON, SC |
| 02/12/18 | $400.00 | NORTH CHARLESTON, SC |
| 02/12/18 | $750.00 | NORTH CHARLESTON, SC |
| 02/12/18 | $350.00 | NORTH CHARLESTON, SC |
| 02/14/18 | $5,000.00 | DANVILLE, VA |
| 03/05/18 | $4,500.00 | DANVILLE VA |
| 03/07/18 | $4,500.00 | DANVILLE VA |

102.    As previously stated, on February 23, 2018, there was a $5,000.00 credit, in the form of a transfer, from SUBJECT ACCOUNT 1 (not reflected in the chart above).

103.    On February 13, 2018, there was an "over the counter" withdrawal/debit from SUBJECT ACCOUNT 3 in the amount of $57,510.00 that was withdrawn in the form of cash by an unknown individual.

**Analysis of Defendant Account #XXXXXX9770 also known as SUBJECT ACCOUNT 4**

104.    Analysis of SUBJECT ACCOUNT 4 revealed that on February 23, 2018, there was a $5,000.00 cash deposit made in Gainesville, Georgia, into SUBJECT ACCOUNT 4.    Analysis revealed that on February 27, 2018, there was a $5,000.00 cash deposit into SUBJECT ACCOUNT 4.    Additional analysis revealed that on December 11, 2017, there was a $5,000.00 cash deposit into SUBJECT ACCOUT 4 made in Gainesville, Florida.    On that same date, December 11, 2017, there was a $5,000.00 cash withdrawal made from SUBJECT ACCOUNT 4 in Auburn, Washington.    On December 15, 2017, there was a $2,000.00 cash deposit made into SUBJECT ACCOUNT 4 in Lawrenceville, Georgia, and on December 18, 2017, there was a $980.00 cash deposit into SUBJECT ACCOUNT 4 in North Charleston, South Carolina.

**Conclusion Regarding SUBJECT ACCOUNT 4**

105.   Based on my training, experience and the evidence and information obtained in the course of this investigation, I believe that SUBJECT ACCOUNT 4, Wells Fargo Bank account XXXXXX9770, is one of several "funnel" accounts used by this drug trafficking organization to launder drug proceeds.  A "funnel" account is either a personal or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting requirements, from which the funds are withdrawn either in cash or check form (or wire transfer) in a different geographic area, with little time elapsing between the deposit and the withdrawals. Based on my training, experience and the evidence and information obtained in the course of this investigation, I believe that Defendant Bank Account XXXXXX9770, is a "funnel" account used to launder drug proceeds in violation of Title 18 U.S.C § 1956(a)(1)(B)(i), making the account forfeitable pursuant to the provisions of Title 18 U.S.C. § 981(a)(1)(A) and Title 18 U.S.C § 984Title 18 U.S.C § 1956(a)(1)(B)(i), making them forfeitable pursuant to the provisions of Title 18 U.S.C. § 981(a)(1)(A) and Title 18 U.S.C § 984.

**Analysis of Defendant Account #XXXXXXXXXX5642
also known as SUBJECT ACCOUNT 5**

106.   Analysis of SUBJECT ACCOUNT 5 revealed that between April 6, 2017, and November 18, 2017, there were eleven round-numbered cash deposits that totaled $53,864.00.

107.   When doing further analysis of SUBJECT ACCOUNT 5, I observed the following:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXX5642 | Cash in | XXXXXX 5642 | 11/13/2017 | $5,000.00 | GAINESVILLE, GA | Credit - Cash | |
| XXXXXX5642 | Cash in | XXXXXX 5642 | 12/8/2017 | $5,000.00 | HUNTSVILLE, AL | Credit - Cash | |
| XXXXXX5642 | Cash in | XXXXXX 5642 | 12/13/2017 | $13,000.00 | RENTON, WA | Credit - Cash | |
| XXXXXX5642 | Cash in | XXXXXX 5642 | 12/14/2017 | $9,000.00 | TACOMA, WA | Credit - Cash | |

| XXXXXX5642 | Cash in | XXXXXX 5642 | 12/16/2017 | $8,000.00 | SEATTLE, WA | Credit - Cash | |
|---|---|---|---|---|---|---|---|
| XXXXXX5642 | Cash out | XXXXXX 5642 | 11/15/2017 | $5,000.00 | AUBURN, CA | O.T.C. Withdrawal (Debit) | WITHDRAWAL MADE IN A BRANCH/STORE |
| XXXXXX5642 | Cash out | XXXXXX 5642 | 12/8/2017 | $5,000.00 | AUBURN, CA | O.T.C. Withdrawal (Debit) | WITHDRAWAL MADE IN A BRANCH/STORE |
| XXXXXX5642 | Check out | XXXXXX 5642 | 12/19/2017 | $5,700.00 | | Check (Debit) | CHECK |
| XXXXXX5642 | Check out | XXXXXX 5642 | 12/20/2017 | $4,300.00 | | Check (Debit) | CHECK |
| XXXXXX5642 | Check out | XXXXXX 5642 | 12/21/2017 | $6,100.00 | | Check (Debit) | CHECK |
| XXXXXX5642 | Check out | XXXXXX 5642 | 12/21/2017 | $5,800.00 | | Check (Debit) | CHECK |
| XXXXXX5642 | Check out | XXXXXX 5642 | 12/29/2017 | $2,500.00 | | Check (Debit) | CHECK |
| XXXXXX5642 | Check out | XXXXXX 5642 | 1/3/2018 | $3,000.00 | | Check (Debit) | CHECK |

108.    As indicated in the chart above, according to records received in this investigation, on November 13, 2017, there was a round-numbered cash deposit into SUBJECT ACCOUNT 5 in the amount of $5,000.00 in Gainesville, Florida, followed by a $5,000.00 over the counter withdrawal in Auburn, California, on November 15, 2017.   On December 8, 2017, there was a $5,000.00 cash deposit into SUBJECT ACCOUNT 5 and on that same date, there was a $5,000.00 over the counter withdrawal in Auburn, California.   On December 11, 2018, there was a $5,000 cash withdrawal in Auburn, California.   Analysis of SUBJECT ACCOUNT 5 revealed that on December 13, 2017, there was a $13,000.00 cash deposit into SUBJECT ACCOUNT 5 in Renton, Washington.   The following date, December 14, 2017, there was a $9,000.00 cash deposit into SUBJECT ACCOUNT 5 in Tacoma, Washington.   On December 16, 2017, there was an $8,000.00 cash deposit into SUBJECT ACCOUNT 4 made in Seattle, Washington.

29

109.   Analysis of SUBJECT ACCOUNT 5 revealed that on December 14, 2017, the same date as the $9,000.00 cash deposit into SUBJECT ACCOUNT 5 in Tacoma, Washington, there was a check remitted from SUBJECT ACCOUNT 5 in the amount of $2,500.00 made payable to "Katy Ng" with the words, "baby shower" listed in the remarks section.   On December 19, 2017, there were two checks issued from SUBJECT ACCOUNT 5, which totaled $10,000.00.   The first check (check number 405) is in the amount of $5,700 made payable to "Allen DENG" with the words, "kitchen remodel" listed in the remarks section.   The second check (check 406) is in the amount of $4,300.00, made payable to "Xye Zhang Zhao" with the words, "work for roofing" in the remarks section.   The next consecutive check, 402, was issued from SUBJECT ACCOUNT 5 on December 18, 2017, in the amount of $6,100.00, made payable to "Wei Bin Zhao" with the words, "roofing work" written in the remarks section of the check.   Check number 404, issued on December 20, 2017, is in the amount of $5,800.00, made payable to "Shuchan Zhao" with the words, "siding work" written in the remarks section of the check.   I observed check 372, issued from SUBJECT ACCOUNT 5, in the amount of $3,000.00 made payable to "Moy Moy Wong."

110.   Analysis of SUBJECT ACCOUNT 5 revealed that prior to any enforcement activity by the DEA, between November 13, 2017, and January 3, 2018, there was $47,980.00 in round-numbered cash deposits, consistent with the way in which drugs are sold for round-numbered amounts of cash, made into the account.   In addition, the vast majority of the cash deposits were made in the same area of the United States where information obtained in this investigation indicate that PHAM was distributing marijuana for sale.   Analysis of SUBJECT ACCOUNT 5 revealed that during that same time frame, there were three over the counter cash withdraws totaling $15,000.00 and six checks remitted from SUBJECT ACCOUNT 5 which totaled $27,400.00.   Total withdrawals from SUBJECT ACCOUNT 5 during the time frame analyzed totaled $42,000.00.

111.   Additional analysis of SUBJECT ACCOUNT 5 revealed six deposits of Western Union Money Orders into SUBJECT ACCOUNT 5.   Based on my training and experience, I know it is a common practice for drug money launderers that traffic in marijuana, to convert the cash received from the sale of marijuana to money orders or cashier's checks, prior to depositing them into a financial institution.   I know that this is done because the cash derived from the sale of marijuana often times emits an odor of raw marijuana, which can be detected both by bank tellers and/or law enforcement.   When reviewing deposits into SUBJECT ACCOUNT 5, I observed the following:

  a.   January 4, 2018: $300.00 Western Union money order 17677961483 deposited into SUBJECT ACCOUNT 5 made payable to Huang DA FU.   According to information received from Western Union, this money order was purchased at 8:47 p.m. from the Quiktrip, 2008 Scenic Highway, Snellville, Georgia.

  b.   January 5, 2018: $400.00 Western Union money order 17257198196 deposited into SUBJECT ACCOUNT 5, made payable to Shiming HUANG. According to information received from Western Union, this money order was purchased at 1:15 p.m. from the Quick Serve, 1427 Athens Street, Gainesville, Georgia.

  c.   January 5, 2018: $600.00 Western Union money order 17257198195 deposited into Wells Fargo Bank account XXXXXX5642 made payable to Shiming HUANG. According to information received from Western Union, this money order was purchased at 1:15 p.m. from Quick Serve, Athens Street, Gainesville, Georgia (the same as above).

  d.   January 5, 2018: $500.00 Western Union money order 17690479529 deposited into SUBJECT ACCOUNT 5 made payable to Huang Da FU.   According to information

received from Western Union, this money order was purchased at 5:15 p.m. from Rite Aid, 3320 Thompson Bridge Road, Gainesville, Georgia.

e. January 28, 2018: $1,000.00 Western Union money order 17688743993 deposited into SUBJECT ACCOUNT 5 made payable to Shiming HUANG. According to information received from Western Union, this money order was purchased at 11:24 a.m. from Kroger, 4205 Winder Highway, Flowery Branch, Georgia.

f. January 31, 2018: $500.00 Western Union money order 47002479459 was deposited into SUBJECT ACCOUNT 5 made payable to Shiming HUANG. According to information received from Western Union, this money order was purchased at 3:57 p.m. from Rite Aid, 3320 Thompson Bridge Road, Gainesville, Georgia.

112.    Analysis of SUBJECT ACCOUNT 5 is indicative of drug money laundering.  As previously stated, PHAM and NGUYEN were arrested in Wyoming with approximately 100 pounds of marijuana.  A search of PHAM's phone had both photos of marijuana and cash deposit slips for round-numbered cash deposits made in the southern part of the United States.

113.    The checks remitted from SUBJECT ACCOUNT 5 all reflect the address of 10431 W. Bear Lake Drive, Boise, Idaho.  According to indices checks, this is a residential address and not a business.

114.    Based on my training, experience and the evidence and information obtained in the course of this investigation, I believe Defendant Bank Account XXXXXX5642, is a "funnel" account used to launder drug proceeds in violation of Title 18 U.S.C § 1956(a) (1) (B) (i), making the account forfeitable pursuant to the provisions of Title 18 U.S.C. § 981(a) (1) (A) and Title 18 U.S.C § 984.

## ADDITIONAL MONEY MOVEMENT RELATED TO PHAM

115.   Detailed below is additional financial analysis related to accounts that I am not seeking to seize the small account balances.  However, I believe, based on my training and experience, that the account activity described below is relevant.

116.   According to records received in this investigation, Navy Federal Credit Union account XXXX0708, titled in the name Pham NGOC is a savings account.  Analysis of the account, which now contains less than $5,000.00, reflected that from November 21, 2016, to February 22, 2018, there were 24 cash deposits that totaled $39,154.00.  Twenty-three of the twenty-four cash deposits into the account were round-numbered, consistent with the way drugs and cash are exchanged. The dates and amounts of cash deposits are detailed in the chart below:

| 12/22/2016 | $1,300.00 |
|---|---|
| 1/9/2017 | $1,000.00 |
| 1/9/2017 | $1,700.00 |
| 2/3/2017 | $3,000.00 |
| 2/3/2017 | $3,000.00 |
| 2/13/2017 | $2,000.00 |
| 2/23/2017 | $3,200.00 |
| 2/23/2017 | $1,500.00 |
| 3/15/2017 | $2,400.00 |
| 4/17/2017 | $1,000.00 |
| 6/6/2017 | $4,000.00 |
| 6/20/2017 | $1,500.00 |
| 7/7/2017 | $470.00 |
| 7/7/2017 | $300.00 |
| 7/7/2017 | $230.00 |
| 7/10/2017 | $1,080.00 |
| 2/7/2018 | $1,000.00 |
| 2/20/2018 | $4,474.00 |
| 2/20/2018 | $100.00 |
| 2/21/2018 | $900.00 |
| 2/22/2018 | $1,500.00 |
| 2/22/2018 | $1,500.00 |
| 2/22/2018 | $2,000.00 |
| TOTAL | $39,154.00 |

117.    I also identified the business account titled in the name NGOC-HOANG PROPERTY LLC with Wayne NGUYEN as a signatory.  It should be noted that the vehicle that PHAM and NGUYEN were arrested in with the approximately 100 pounds of marijuana was rented in the name of Wayne NGUYEN.  According to records received in this investigation, this account was established on August 10, 2016, with expected annual revenue less than $100,000.00.  The nature of the business is described as "real estate rentals." Analysis of bank records revealed that between January 3, 2017, and November 30, 2017, there were cash deposits totaling $192,037.60 into the account and cash withdrawals totaling $70,461.00 and internal transfers totaling $48,345.50.

### Post-Seizure Investigation

118.    Subsequent to the seizure of Defendant Bank Accounts, I received a telephone call on Thursday, June 21, 2018, from a male who called from telephone number 208-890-9673 (same phone number associated to Huang MA DAFU and Xiuyan ZHANG according to Wells Fargo Bank records related to Defendant Bank Account XXXXXX5642) who identified himself as "Shiming DAFU" believed to be Shiming HUANG.  It should be noted that according to Wells Fargo bank records, Shiming HUANG'S address is listed as 10431 W. Bear Lake Drive, Boise, Idaho, which is the same address listed for Xiuyan ZHANG while Huang MA DAFU'S address is listed as 21513 131st Street, E. Sumner, Washington).

119.    In summary, the male indicated that he did not speak English very well and that he spoke Chinese (Mandarin/Cantonese).  I explained to the caller that I understood the content of the conversation with the male individual without much difficulty.  However, when I attempted to clarify statements made by the male individual, the male individual indicated that he did not speak English very well, almost as a tactic to avoid confirming the information provided.  It should be noted that on more than one occasion, when apparently frustrated, the individual exclaimed,

"Jesus!" I noted this because the individual did not speak any Chinese to me when trying to explain his position, however, the individual later stated that if there was an in-person interview, the male individual would need a translator and possibly an attorney. The male individual said that he was a signer on a bank account that had been seized but did not identify which account. The individual stated that he had opened "the account" for his father and mother, who did not speak English well. I asked the individual if he had ever made any deposits into the account and the individual said he had not. Later in the conversation, the individual changed his account and said that he had made deposits into the accounts to "help his parents." I asked the individual about the deposits and the individual said that he had made cash deposits of $1,000.00, $2,000.00 and $500.00. I explained that earlier in the conversation, the individual said he had not made any deposits into the account. It was at this time that the individual said he did not speak English well. Earlier in the conversation, when I was explaining the nature of the investigation into the PHAM drug trafficking and money laundering investigation, the individual said that he had worked for NGOC PROPERTIES (SUBJECT ACCOUNT 3) cleaning a home. The individual said that he saw "things growing" in the house but was not clear if "the things growing" were marijuana. The individual said that the police got "close to the house" but was not sure if they removed anything from the house. I asked if the individual could provide the address and the individual said he could not. The individual said that he lived in Idaho and also spent time in Seattle, Washington. I explained to the individual that based on the inconsistent statements, it would be better to meet in person and conduct an interview.

## REQUEST FOR RELIEF

By reason of the facts set forth and incorporated herein, the Defendants are properly forfeitable to the United States under 21 U.S.C. § 881(a)(6) as proceeds of and traceable to unlawful sales of controlled substances and 18 U.S.C. § 981(a)(1)(A) as property involved in and

traceable to money laundering. Wherefore, the United States, as Plaintiff, respectfully requests the following:

a. a warrant of arrest for the defendant properties be issued;

b. that notice of this action be given to all persons who reasonably appear to be potential claimants of interests in the property to appear and show cause why the forfeiture should not be decreed;

c. that judgment declare the Defendants be forfeited and condemned to the United States of America for disposition according to law;

d. the Plaintiff be awarded its costs and disbursements in this action;

e. the Court order any such other and further relief as this Court deems proper and just.

**DATED** this _21st_ day of November, 2018.

Respectfully submitted,

MARK A. KLAASSEN
United States Attorney

By:   _Stephanie Hambrick_

STEPHANIE A. HAMBRICK
Assistant United States Attorney

## **VERIFICATION**

I, Special Agent David Tyree, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration. I have read the contents of the foregoing Complaint for Forfeiture *in rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements contained therein are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers as well as my investigation of this case, together with others, as a Special Agent of the Drug Enforcement Administration.

Executed on this _21_ day of November, 2018.

 

_____
DAVID TYREE, Special Agent
Drug Enforcement Administration

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**DEFENDANTS**

$3,451.13 IN U.S. CURRENCY SEIZED FROM WELLS FARGO BANK ACCOUNT, NUMBER XXXXXX9770 and $9,260.32 IN U.S. CURRENCY

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
U.S. Attorney's Office
P.O. Box 22211, Casper, WY 82602
307-261-5434

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |

*(table continued — full Nature of Suit checklist)*

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
& Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
Student Loans
(Excludes Veterans)
☐ 153 Recovery of Overpayment
of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
Liability
☐ 320 Assault, Libel &
Slander
☐ 330 Federal Employers'
Liability
☐ 340 Marine
☐ 345 Marine Product
Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
Product Liability
☐ 360 Other Personal
Injury
☐ 362 Personal Injury -
Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury -
Product Liability
☐ 367 Health Care/
Pharmaceutical
Personal Injury
Product Liability
☐ 368 Asbestos Personal
Injury Product
Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
Property Damage
☐ 385 Property Damage
Product Liability

**FORFEITURE/PENALTY**
☒ 625 Drug Related Seizure
of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards
Act
☐ 720 Labor/Management
Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical
Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement
Income Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal
28 USC 157
**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark
**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff
or Defendant)
☐ 871 IRS—Third Party
26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/
Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information
Act
☐ 896 Arbitration
☐ 899 Administrative Procedure
Act/Review or Appeal of
Agency Decision
☐ 950 Constitutionality of
State Statutes

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
Accommodations
☐ 445 Amer. w/Disabilities -
Employment
☐ 446 Amer. w/Disabilities -
Other
☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate
Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee -
Conditions of
Confinement

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration
Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 USC 881 and 18 USC 981(a)(1)(A)

Brief description of cause:
Forfeiture of Defendant Property (U.S. Currency)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____

DOCKET NUMBER 18-CV-197-F

DATE
11/21/2018

SIGNATURE OF ATTORNEY OF RECORD
*Stephen L. Simonton for*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT Fee waived   APPLYING IFP _____   JUDGE NDF   MAG. JUDGE KHR

# Please wait...

If this message is not eventually replaced by the proper contents of the document, your PDF viewer may not be able to display this type of document.

You can upgrade to the latest version of Adobe Reader for Windows®, Mac, or Linux® by visiting  http://www.adobe.com/go/reader_download.

For more assistance with Adobe Reader visit  http://www.adobe.com/go/acrreader.

Windows is either a registered trademark or a trademark of Microsoft Corporation in the United States and/or other countries. Mac is a trademark of Apple Inc., registered in the United States and other countries. Linux is the registered trademark of Linus Torvalds in the U.S. and other countries.